UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| JOY MARSHALL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 14-229-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| SUPER SERVICE, LLC, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of cross-motions for summary judgment filed by Plaintiff Joy Marshall and Defendant Super Service, LLC ("Super Service").  [Record Nos. 31; 35]  The plaintiff asserts claims of sex-based discrimination, retaliation, and hostile work environment against the defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*, and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010, *et seq.* [Record No. 1-4][1]  For the reasons outlined below, Super Service's motion for summary judgment will be granted and Marshall's motion for summary judgment will be denied.

## I.

Super Services, LLC is a trucking corporation with its headquarters located in Grand Rapids, Michigan and terminals located in several states.  [Record No. 1-4, ¶ 2]  Prior to April 2011, three separate "sister" companies comprised the main company: Gainey

---

[1]    Although discussed during oral arguments on the pending motions, further review of Marshall's Complaint confirms that she has not asserted a claim for intentional infliction of emotional distress under Kentucky law.

Transportation located in Michigan, Lester Coggins located in Florida, and Super Service, Inc. located in Kentucky.  [Record Nos. 34-1, pp. 2, 8; 31-25, p. 52]  In 2010, Marshall worked as a night dispatcher for the terminal located in Okahumka, Florida.  [Record No. 34-19, pp. 6, 74]  Around September 2010, upon learning that her particular terminal was closing, the plaintiff contacted John Kidd, Director of Operations for client Vascor, about a dispatch position at the terminal located in Somerset, Kentucky.  [Record No. 31-25, p. 54]  At the time, Marshall was pregnant and feared losing her maternity leave and healthcare benefits.  [*Id.*]  In December 2010, Marshall began working as a night dispatcher at the Somerset terminal.  [*Id.*, p. 70; Record No. 1-4, ¶ 8]  Her moving expenses were not covered, and she took a $2,600.00 reduction in pay as a result of the transfer.  [Record Nos. 31-25, p. 70; 1-4, ¶ 17]  Around the same time, three male employees with positions different from Marshall's were asked to transfer to the facility located in Ellenwood, Georgia.  [Record No. 31-19, pp. 73–74]  Their pay was not reduced, and they also received reimbursement for moving expenses.  [Record No. 34-1, p. 4]

As a night dispatcher, Marshall reported to Kim Caldwell.  [Record No. 31-25, p. 118]  However, in July 2011, Super Services moved the night dispatch position to the Grand Rapids facility.  As a result, the plaintiff became a breakdown coordinator, reporting to Ivan Randall.  [*Id.*; Record Nos. 34-4, p. 10; 34-7, p. 30]  Randall reported to Fran Kephart, the head of the maintenance department.  [Record Nos. 31-30, p. 65; 34-1, p. 23]  Most breakdown coordinators handled only mechanical and maintenance issues, but with respect

to the customer Vascor, the plaintiff continued to address both breakdown and dispatch issues.[2]  [*See, e.g.*, Record Nos. 31-9, p. 2; 34-1, p. 34.]

On April 20, 2013, Marshall contacted Kidd by phone to express her concern about working alone with Kevin Taylor, who had allegedly recently assaulted his wife and checked into a mental facility.  [Record No. 34-19, pp. 25−26]  Taylor also had a history of assault charges involving female victims.  [Record No. 34-7, p. 39]  Kidd stated that he would look into the situation and e-mailed Marshall the next day when she was at work with Taylor, asking if she was "okay."  [Record Nos. 34-19, p. 27; 31-5, p. 2]  Marhall responded that she was.  [*Id.*]  She experienced no problems with Taylor that day.  [Record No. 34-19, p. 27]

On May 2, 2013, Randall e-mailed Marshall about reporting to work at 5:00 p.m. and leaving at 2:00 a.m. on Mondays, Thursdays, and Fridays, even though she was originally expected to arrive at 6:00 p.m.  [Record Nos. 31-6; 34-19, p. 64]  Marshall responded with "[w]ill do."  [Record No. 31-6]  Believing that the schedule change would begin the following week and, consistent with Super Service's usual practice, Marshall arrived to work at 6:00 p.m. the following day.  [Record No. 34-19, p. 65]  As a result of her late arrival, Randall wrote-up Marshall on May 9, 2013.  [Record No. 31-7]  However, Kephart decided not to proceed with formal discipline, removing out the write-up.  [Record Nos. 31-29, p. 54; 34-5, pp. 135−36]

---

[2]     During oral argument on the cross-motions for summary judgment, defense counsel was uncertain whether Marshall handled Vascor duties while working in Florida.  However, Marshall's brief, as well as the record, reflect that she handled Vascor dispatch in Florida, as well.  [Record Nos. 34, p. 6; 34-1, p. 34]

On May 3, 2013, Marshall sent Kephart an e-mail regarding whether Taylor would be allowed to return to work while on work release, but Kephart responded that he did not know whether Taylor was in a work release program.  [Record No. 31-8]  Though Taylor was permitted to work on May 4th with Marshall, Super Services subsequently accommodated Marshall's requests, having Taylor not work with her on May 5th.  [Record Nos. 34-1, pp. 47–49; 34-19, p. 50]  However, the defendant allowed Taylor to return to work on May 9th after the charges were dropped.  [Record Nos. 31-10; 34-1, pp. 47–48; 34-4, p. 24]  That day, Marshall sent an e-mail to Kidd asking for clarification of her Vascor duties and informing him of her conversation with Kephart concerning Taylor.  [Record No. 31-9]  She also acknowledged that she was aware that she was to report to Randall, as her supervisor.  [*Id.*]

Subsequently, on May 10, 2013, Marshall met with Kephart to inform him that Taylor had used vulgar language with a vendor and had acted erratically.  [Record No. 34-6, p. 111]  However, Kephart stated that her complaint was "hearsay."  [Record No. 31-10]  As a result, Marshall e-mailed Randall and Caldwell requesting clarification on the Taylor situation and explaining why her complaint was not hearsay.  [*Id.*]

On May 12, 2013, Marshall called Peter Hussey, the night breakdown coordinator, at 1:09 a.m. to inform him that she was sick.  [Record No. 31-11]  Hussey communicated her message to Randall.  [*Id.*]  Because Marshall failed to follow Super Service's call-in procedures, Kephart conducted a counseling session with her.  [*Id.*; Record No. 31-2, p. 7]  Sherry Daughetee attended this session.  [Record No. 35-13]  Kephart explained that Marshall was being disciplined for failing to call her manager or immediate supervisor.  He also informed Marshall that her skirt length violated company policy.  [Record Nos. 31-2, p.

10; 31-25, pp. 157, 164; 31-12]  Upset with the write-up, Marshall e-mailed John Kidd and Steve Maat, Director of Human Resources, on May 14, 2013, disputing the call-in procedure. [Record No. 31-13]  In addition, Marshall claimed that when she made a comment about having to work alone when Taylor was gone, Kephart asked, "is it so hard to pick up a phone for four hours?"  [*Id.*]  Marshall termed the e-mail a "formal complaint" and described Kephart's conduct as "discriminatory."  [*Id.*]  Maat responded that day, confirming that Marshall should report to Randall and that Taylor did not pose a safety risk at the company. [Record No. 31-14]

Two days later, Marshall again e-mailed Maat, explaining her reason for calling Hussey instead of Randall to inform him that she was sick on May 12th.  [Record No. 31-15] She also wrote:

> [w]ell, regarding my complaint of discrimination from Mr. Fran Kephart.  Fran has usurped the power of the position Kim holds and in addition to the recent disciplinary action taken against me, unfortunately, it appears Fran has an issue addressing and dealing appropriately with female employees.  If a female is to sit in the office while I have a write up, it would be Kim as she is supposed to be my immediate supervisor not the payroll officer . . . . Regarding any claims from Fran that my dress code was a violation in any way is also considered hearsay at this point. . . .  Again, I find that grossly offensive that Fran would pay that much attention 'in inches' to my skirt, but not have the professionalism to release a memo for a chain of command [] which he is trying to enforce.  In doing that he is alienating female supervisor Kim Caldwell.

[*Id.*]  On May 17, 2013, Maat reiterated that Randall was Marshall's supervisor and that, in any event, Hussey certainly was not her supervisor.  [Record No. 31-16, p. 2]  He also stated, "[i]f you are claiming Fran discriminates against women, please describe the discriminatory incidents in as much detail as possible so I can investigate."  [*Id.*]  But Marshall did not

respond.   [Record Nos. 31-25, p. 177; 34-1, p. 53]   Maat questioned Caldwell about Kephart's conduct, and she reported no problems with him.  [Record No. 31-28, pp. 52–53]

Marshall chose to work the night shift in December 2013, after Super Service altered the breakdown/Vascor crew's schedule.[3]  [Record Nos. 31-17; 31-25, p. 104; 31-26, 187] On January 10, 2014, between 3:00 and 4:00 a.m., Marshall became aware that one of the Vascor teams was involved in an accident.  [Record No. 31-26, p. 210]  She concedes that it was her duty to report the accident to the Safety Department ("Safety").  [Record Nos. 31-28, p. 60; 31-31, p. 24; 34, p. 16; 34-1, p. 17]  Marshall knew that Safety needed to know as soon as possible about such accidents, although she disputes whether she was the only person with the responsibility to notify Safety on the night in question.  [Record No. 31-26, pp. 193–200] Marshall had notified Safety in the past about accidents.  [Record No. 31-19, p. 14]

Soon after learning of the incident, Marshall called Roger Beachy to notify him of the event.  [Record No. 31-31, p. 22]  Thereafter, at 5:23 a.m., Marshall notified John Kidd, Roger Beachy, Mark Collins, and Guy Holden, none of whom were in Safety, of the accident *via* e-mail, writing that, "[s]afety and Vascor have not been notified as of yet."  [Record No. 31-18]  She claims that Beachy informed her not to call anyone else about the accident, although he contests her assertion.  [Record Nos. 31-26, p. 221; 31-31, p. 24]

When Safety Manager Chuck Creekmore entered the facility four hours after Marshall received notification of the accident, Kidd discovered that the accident had not been reported to Safety.  [Record No. 31-30, p. 74]  As a result, Kidd instructed Beachy to send

---

[3]     With the shift-change, Marshall worked six hours on Wednesdays.   On Thursdays, Fridays, and Saturdays, she worked from 6:00 p.m. to 6:00 a.m.  [Record No. 34-4, p. 67]

the information to Creekmore.  [*Id.*, p. 75]  At the behest of Super Service CEO Dan Strong, Maat investigated what had happened, speaking with Creekmore and Kephart.  [Record No. 31-28, p. 59]  He discovered that Marshall had contacted Mark Collins during her shift on January 10, 2014, to have him fill in for her because she was not feeling well.  [Record No. 34-18, p. 15]  Collins arrived around 5:35 a.m., and Marshall told him that Beachy was handling the accident.  [*Id.*]  Determining that Marshall was responsible for the failure to contact Safety, Strong, Maat, Kephart, and COO Roger Waddle concluded that Marshall should be terminated.  [Record Nos. 34-1, p. 29; 31-20]

On January 13, 2014, Kephart and Kidd met with Marshall to inform her that she was being terminated for failing to report the accident to Safety.  [Record No. 34-7, p. 76]  On March 7, 2014, Marshall filed a charge against Super Service with the Equal Employment Opportunity Commission ("EEOC").  [Record No. 31-21]  In the charge, the plaintiff made claims of sex discrimination and retaliation.  [*Id.*]  The EEOC dismissed the charge on August 22, 2014.  [Record No. 31-22]

The present action was filed on November 13, 2014 in the Pulaski Circuit Court in Kentucky.  [Record No. 1-4]  In her Complaint, Marshall alleges claims of discrimination, retaliation, and hostile work environment under both Title VII and the Kentucky Civil Rights Act ("KCRA").  [*Id.*, ¶ 3]  The defendant removed the action on December 11, 2014. [Record No. 1]  After the close of discovery, Super Service filed a motion for summary judgment on October 15, 2015, requesting oral argument.  [Record No. 31]  On November 5,

2015, Marshall filed her response, along with her motion for summary judgment.[4]  [Record Nos. 34; 35]  The defendant has replied [Record Nos. 39; 40], and oral argument was held on April 1, 2016.  [*See* Record No. 65.]

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[5]

---

[4]    Marshall's motion for summary judgment was untimely.  [*See* Record No. 10, ¶ 8.]  The parties requested an extension for filing dispositive motions, which the Court denied.  [Record Nos. 28; 29]  Super Service also requested reconsideration, but the Court denied that, as well. [Record Nos. 30; 32]  However, because the same issues appear in both motions for summary judgment, the Court has considered the merits of the plaintiff's motion.

[5]    Marshall cites to Rule 56 of the Kentucky Rules of Civil Procedure [Record No. 34, p. 19], but the summary judgment standard under the Federal Rules of Civil Procedure applies here.  *See Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001).

## III.

Under Title VII of the Civil Rights Act of 1964 and Chapter 344 of the Kentucky Civil Rights Act, it is unlawful for an employer "to discharge any individual, or otherwise [] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *see* Ky. Rev. Stat. § 344.040(1)(a).[6] "[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). A plaintiff may establish a claim under Title VII or the KCRA by offering either direct or circumstantial evidence of discrimination. *Bartlett v. Gates*, 421 F. App'x 485, 487 (6th Cir. 2010).

### A.    Direct Evidence

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). If a plaintiff produces "credible direct evidence, the burden shifts to the employer to show that it

---

[6]     The KCRA's discrimination provisions "track [] federal law and should be interpreted consonant with federal interpretation." *Gragg v. Somerset Technical College*, 373 F.3d 763, 767 n.1 (6th Cir. 2004) (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky. 1992)). Accordingly, the Court will, for the most part, analyze these claims simultaneously. However, the KCRA does not have a provision mirroring 42 U.S.C. § 2000e-2(m). Instead, Kentucky courts require a plaintiff in a mixed-motive case to show that discriminatory animus was a "substantial factor" or "contributing or essential factor" in an adverse employment action. *Mendez v. Univ. of Ky. Bd. of Trustees*, 357 S.W.3d 534, 541 (Ky. Ct. App. 2011).

would have taken the employment action of which the plaintiff complains even in the absence of discrimination." *Id.*

Marshall argues that she has presented sufficient direct evidence of sex animus to require that summary judgment be entered in her favor.  [Record No. 34, p. 21 n.12]  She points to the facts that: (i) only men were offered transfers from the Florida terminal; (ii) the men were reimbursed for moving expenses; (iii) the men's pay remained the same; and (iv) her pay was not increased when she took on additional duties.  [*See id.*]  However, these facts do not constitute direct evidence of discrimination because they do not *require* the conclusion that unlawful discrimination was a motivating factor in Super Service's decision—they merely *suggest* it.  *See White*, 429 F.3d at 238.  There are a myriad of non-discriminatory explanations why the three particular individuals were offered opportunities to relocate with expenses paid.  Thus, these facts constitute circumstantial evidence of gender discrimination.

Generally, direct evidence appears in the form of comments made or recorded by the employer or its agents.  *See, e.g.*, *White*, 429 F.3d at 238.  After reviewing the record, the Court has determined that the only statement remotely related to gender is Kephart's warning to Marshall that her skirt did not comply with Super Service's policies.  [Record No. 31-12]

"Isolated and ambiguous comments are insufficient to support a finding of direct discrimination." *Id.* at 239 (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)).  Courts assess the relevancy of an allegedly discriminatory remark by looking to: (i) the purpose and content of the statement; (ii) the identity of the speaker and his role in the adverse employment decision; and (iii) the temporal proximity between the statement and the

- 10 -

adverse employment decision.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355−57 (6th Cir. 1998) (reversing summary judgment where multiple high-level officials made discriminatory remarks).

Here, Kephart's statement was both isolated and ambiguous.  Marshall does not allege that he made any other comments related to gender, either directed toward her or others.  Further, the statement was ambiguous because Kephart merely informed Marshall that her attire needed to conform to the company's rules, which were outlined in writing.  [Record Nos. 31-2, p. 10; 31-25, p. 164]  Marshall does not dispute that her skirt length did not comply with company policy.  [*See* Record No. 31-15.]  As a result, Kephart's statement does not suggest discriminatory animus. *See Ercegovich,* 154 F.3d at 355.  While the speaker of the statement was the person involved in the decision to terminate Marshall, the statement was made nearly eight months before the decision was made to terminate the plaintiff in response to a specific incident.  [Record Nos. 31-12; 31-20]  To the extent Marshall claims that other disciplinary actions resulted in her termination, it is important to note that the other disciplinary actions occurred prior to Kephart's remark.  Because Kephart's comment was isolated, ambiguous, and not temporally proximate to her discharge, it does not establish that Marshall was discharged based on an impermissible motive.  *See id.*

### B.   Indirect Evidence

If a plaintiff cannot provide direct evidence of improper motive, she may offer indirect and circumstantial evidence of such a motive under the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  However, where the plaintiff makes a mixed-motive claim of discrimination, the Sixth Circuit has dispensed with

the *McDonnell-Douglas* approach during the summary judgment phase. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). Instead, a plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff," and (2) sex was a "motivating factor" for the action. *Id.* Under this approach, the defendant has an affirmative defense under 42 U.S.C. § 2000e-5(g)(2)(B) if it can demonstrate that it would have taken the adverse action "in the absence of the impermissible motivating factor." If a defendant succeeds in establishing the defense, the plaintiff is only entitled to declaratory and injunctive relief. 42 U.S.C. § 2000e-5(g)(2)(B)(i)−(ii).

Marshall states in her Complaint that Super Service discriminated against her "in substantial part because of her sex." [Record No. 1-4, ¶ 25] In addition, in her response in opposition to the defendant's motion for summary judgment, she emphasizes that the Sixth Circuit has abandoned the *McDonnell-Douglas* framework in some cases. [Record No. 34, p. 21] Consequently, she is entitled to the less burdensome, mixed-motive analysis of her Title VII claims. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649−50 (6th Cir. 2012).

### 1.    Mixed-motive Discrimination

#### a.    Transfer

First, Marshall claims that Super Service failed to offer her an opportunity to transfer from the Florida terminal based at least, in part, on her gender.[7] [Record No. 34, p. 21]

---

[7]    Marshall never actually makes this allegation in her Complaint. [*See* Record No. 1-4.] The Court only addresses the claim because it is implicated in the defendant's explanation

- 12 -

However, she cannot demonstrate that the failure to offer her a transfer constitutes an adverse employment action.  *See White*, 533 F.3d at 400.  An adverse employment action is an action "that results in a materially adverse change in the terms and conditions of plaintiff's employment[,] such as a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities."  *Love v. Elec. Power Bd. of Chattanooga, EPB*, 392 F. App'x 405, 408 (6th Cir. 2010).  Denial of a lateral transfer is not an adverse employment action.  *See id.*; *Freeman v. Potter*, 200 F. App'x 439, 443 (6th Cir. 2006).  Analogously, failing to offer a lateral transfer generally is not an adverse employment action.

However, a company's failure to offer a lateral transfer may constitute an adverse employment action if the plaintiff loses her position because she was not transferred prior to a company-wide lay-off.  "Where the employer eliminates an employee's position pursuant to a reduction in force or a reorganization, or fails to transfer an employee when other employees benefited from transfers," the plaintiff makes a *prima facie* case of discrimination by demonstrating that: (1) she was a member of a protected class; (2) she was qualified for the transferee position; (3) she was discharged; and (4) similarly-situated employees outside the protected class were transferred.  *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 591 (6th Cir. 2006).  Because *Felder* was decided before *White*, 533 F.3d at 400, this framework may only *inform* the second prong of the *White* analysis.  *See White*, 533 F.3d at

---

concerning why transferred males did not receive a reduction in their pay and received moving expenses.  [Record No. 31-1]  Marshall, however, raised this argument in her response in opposition to Super Service's motion for summary judgment.  [Record No. 34, p. 5]

393 (reasoning that "such an inquiry sheds light" on the employer's actual motivation for an employment decision).

Marshall cannot demonstrate that she was discharged while working at the Florida terminal.  In fact, she cannot even demonstrate that she was not transferred.  Although Marshall argues that Super Service's failure to *offer* her a transfer was the adverse employment action, contrary to the reasoning in *Love*, 392 F. App'x at 408, and *Freeman*, 200 F. App'x at 443, this is problematic because she effectively short-circuited Super Service's opportunity to offer her such a transfer.  *See Felder*, 187 F. App'x at 591 (suggesting that failure to offer a transfer is an adverse employment action where the employee is discharged or fails to receive a transfer).  Because Marshall fails to establish an adverse employment action with respect to the company's failure to offer her a transfer, she cannot satisfy the first prong of the *White* analysis.  *See White*, 533 F.3d at 400.

But even if the Court accepts Marshall's argument, she has not provided any evidence that she was qualified for the relevant positions—the positions that were offered to the three men.  *See Felder*, 187 F. App'x at 591.  On the other hand, the defendant has proffered evidence that the Georgia positions were above Marshall's qualifications.  [Record No. 34-1, pp. 73–74]  Further, the only evidence Marshall has presented regarding sex as a motivating factor is the mere fact that three males, and no females, were offered transfers.  No reasonable jury could find that this fact, standing alone, is indicative of gender bias, especially without any indication that Marshall qualified for the Georgia positions.  *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 439 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 84 (2014) (granting summary judgment to defendant under mixed-motive analysis where

- 14 -

there was "no evidence indicating that [the decisionmaker] harbored animus against African-Americans").

To the extent Marshall raises a failure-to-promote claim, she fails to "demonstrate that a genuine issue of material fact existed concerning whether [her gender] was a factor" in Super Service's employment decision. *See Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011) (where undisputed evidence demonstrated that wage decision was based on differences in experience, position, and production goals, plaintiff's mixed-motive claim could not withstand summary judgment); *see also Alcala v. Whirlpool Corp.*, 675 F. Supp. 2d 765, 770 (N.D. Ohio 2009) (granting summary judgment to defendant on mixed-motive, failure-to-promote claim where plaintiff had different qualifications and experience from the person who was promoted).   As a result, Marshall's failure-to-transfer and/or failure-to-promote claim cannot survive summary judgment. *See White*, 533 F.3d at 400.

### b.      Transfer Benefits

Marshall next asserts that Super Service reduced her pay upon transferring her due to her gender.   [Record No. 34, p. 7]   A transfer resulting in a pay decrease constitutes an adverse employment action.   *See Deleon v. Kalamazoo Cnty. Road Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014).   However, Marshall has failed to offer sufficient evidence that gender was a "motivating factor" in the decision to reduce her pay.   *See White*, 533 F.3d at 400. Again, her only evidence of gender animus is that the three transferred males maintained their rate of pay and received reimbursement for moving expenses, while she did not.   Super Service contends that these incentives were necessary to convince the three male employees to transfer locations, whereas no incentives were needed in Marshall's case because she

- 15 -

requested a transfer.  [Record No. 31-28, pp. 4–5, 70–71]  The company also emphasizes that the male employees were transferred to the Georgia terminal which has a different pay structure.  [Record No. 34-1, p. 13]  Further, the three male employees held supervisory and management-type positions, whereas Marshall did not.   [Record No. 34-1, pp. 73–74] Marshall does not dispute these facts.

The Court may consider the employer's legitimate, non-discriminatory reason for a decision, even in mixed-motive cases.  *See, e.g.*, *Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 436 (6th Cir. 2012) (concluding that plaintiff failed to demonstrate a genuine issue of material fact existed regarding employer's proffered reason for the employment action).  Here, Super Service has provided strong evidence to explain why Marshall received a reduction in pay and no reimbursement for moving expenses upon her transfer because the employees who received the benefits were not comparable.  *See, e.g.*, *Johnson-Romaker v. Kroger Ltd. P'ship One*, 609 F. Supp. 2d 719, 730–31 (N.D. Ohio 2009) (determining that mixed-motive claim failed where plaintiff could not proffer examples of employees who committed comparable violations but received less stringent discipline).  In addition, it has shown that Marshall receives the mid-range pay at the Kentucky facility.  [Record No. 31-28, p. 72]  Taking into consideration the factors raised by Super Service, no reasonable jury could determine that gender animus motivated Super Service to reduce Marshall's pay and not offer her reimbursement for moving expenses upon transfer.  *See White*, 533 F.3d at 400.

### c.    Increased Work Duties

To the extent that Marshall alleges gender discrimination because Super Service did not offer her a raise when she transitioned from night dispatcher to breakdown coordinator, it

is dubious whether that constitutes an adverse employment action.  *See, e.g.*, *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) ("This court has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."); *Fricke v. E.I. Dupont Co.*, No. Civ. A. 3:02CV536-S, 2005 WL 1949552, *3 (W.D. Ky. Aug. 11, 2005) (addressing age discrimination claim).  [Record No. 34, p. 22]  In any event, Marshall does not offer any evidence that her increased duties resulted from gender animus.  *See White*, 533 F.3d at 400. All night dispatch positions were eliminated from the Somerset facility.  [Record No. 31-26, p. 196]  Further, as a breakdown coordinator, Marshall was paid the average salary.  [Record No. 31-28, pp. 71−72]  Additionally, the defendant highlights one male employee handling both breakdown and Vascor issues who was paid comparably to the plaintiff.  [Record No. 31-26, p. 42]  Other employees handled both breakdown and Vascor duties, but Marshall does not contend that they were paid more than she received or that they received pay increases when transitioning from the night dispatch to the breakdown coordinator position. [Record No. 34-1, p. 31]  Without any evidence of gender animus, this claim fails under the applicable summary judgment standard.  *See White*, 533 F.3d at 400.

### d.    Disciplinary Actions

The Complaint seems to assert that Marshall's "write-ups" resulted from gender animus.  [Record No. 34, pp. 12−13]  She received three warnings/write-ups: one for failing to arrive at her new 5:00 p.m. start-time, one for failing to follow call-in procedures, and one for wearing a skirt that did not meet company policy.  Marshall does not dispute that she failed to comply with company rules and regulations; instead, she claims that she has offered

valid explanations for her errors.  [Record Nos. 34-5, p. 164; 34-19, pp. 64; *see* Record No. 31-13]  Further, the first write-up was expunged.  [Record No. 34-5, pp. 135−36]

"In general, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary."  *White*, 533 F.3d at 402.  Written counseling and write-ups are not usually adverse employment actions.  *See Hill v. Nicholson*, 383 F. App'x 503, 509 (6th Cir. 2010); *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 823 (M.D. Tenn. 2011).  Marshall's three warnings do not constitute adverse employment actions, so any discrimination claim based solely on those warnings must fail.  *See White*, 533 F.3d at 400.  However, the Court will consider these warnings to the extent that they influenced the decision to discharge Marshall.

### e.      Discharge

Marshall contends that Super Service discharged her because she is a female.  [Record No. 34, p. 27]  Discharge is an adverse employment action.  42 U.S.C. § 2000e-2(a)(1).  The plaintiff's evidence that gender animus influenced the decision to terminate her includes: (i) Kephart's warning that her skirt length violated company policy; (ii) Kephart's alleged disrespectful tone and body language; (iii) male employees who were not terminated for violating company policies and procedures; and (iv) increased scrutiny of her performance after her complaints about Taylor.  [*Id.*, pp. 25−26]  Conversely, Super Service asserts that Marshall was discharged because she failed to report the January 10, 2014 accident to Safety.  [Record No. 31-1, p. 28]

Kephart's warning concerning Marshall's skirt length does not constitute evidence of discriminatory motive for the reasons previously discussed.  In a mixed-motive case, the

- 18 -

Court still considers "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *See Lopez v. Am. Family Ins. Co.*, 618 F. App'x 794, 800 (6th Cir. 2015) (Title VII race discrimination claim). Although Kephart was one of the supervisors involved in the decision to discharge Marshall, the substance of his comment was not indicative of gender bias. Instead, he was focused on company policy, and Marshall does not contend that she was not violating the policy. [Record No. 31-15] Further, the remark was made nearly eight months before the company's termination decision. [Record Nos. 31-12; 31-20] The nexus between the challenge3d comment and the termination decision is too far removed, weighing in favor of summary judgment for Super Service on this issue.

Kephart's alleged disrespectful body language included "shrugging his shoulders" and "holding his palms up in the air." [Record No. 31-25, pp. 240–41] In and of themselves, these actions do not necessarily suggest gender animus, as they may have simply represented animus towards the plaintiff unrelated to her gender. *Compare with Culberson v. Doan*, 65 F. Supp. 2d 701, 706 (S.D. Ohio 1999) (stating that "particular expressions of affection may be laden with disrespect for women").

Marshall argues that Kephart treated another female employee with similar disrespect: Kim Caldwell. [Record No. 31-15] However, Caldwell denies any such treatment [Record No. 31-28, pp. 52–53], and Marshall was unable to provide any specific examples of Kephart acting disrespectfully towards Caldwell. Rather, she claims that Kephart alienated Caldwell by not involving Caldwell in counseling sessions with Marshall or allowing Marshall to report to Caldwell. [Record No. 31-15] However, the plaintiff does not dispute that

- 19 -

Caldwell was no longer her direct supervisor, meaning that the conclusions Marshall inferred from Kephart's conduct were both subjective and unreasonable.  [Record No. 34-5, p. 118]  Moreover, Marshall only states that Kephart "would not" have used certain tones with a male employee—not that he *did not* use such tones with male employees—emphasizing that Marshall's allegations regarding Kephart are speculative.  *See Alomari v. Ohio Dep't of Public Safety*, 626 F. App'x 558, 566 (6th Cir. 2015) (finding that "no reasonable juror could believe that discriminatory animus motivated" disparate treatment where employer provided reason for the treatment and plaintiff responded with speculation).  No reasonable juror could interpret Kephart's treatment of Marshall as motivated by gender bias.

Consequently, Marshall attempts to create an inference of discriminatory motive by showing disparate treatment.  To demonstrate disparate treatment, Marshall points to several employees who were not discharged after violating company rules.  For instance, she notes that Kevin Taylor left work early on multiple occasions and had domestic violence charges made against him.  [Record Nos. 31-23, p. 5; 31-26, p. 268]  While leaving work early is similar to Marshall's late arrival, it appears that Taylor received harsher punishment than Marshall because he was cited for his behavior, whereas Marshall's write-up was expunged.  [Record No. 31-26, p. 268]

Taylor's domestic violence charge is not comparable to the conduct that ultimately resulted in Marshall's discharge: the failure to report an accident to Safety.  First, Taylor's domestic violence charge was not related to work at Super Service.  Second, it was merely a charge, not a conviction.  Super Service was entitled to conclude that Taylor's charge did not necessitate discipline because it had little, if any, effect on his work performance.  *See*

- 20 -

*Alomari*, 626 F. App'x at 566 ("[B]eyond pure speculation, Deputy Director Mack's assertions provide no evidence of a discriminatory motive behind the disparate treatment of Plaintiff and Martin."). To the extent that Taylor was disrespectful towards a vendor [Record No. 34-6, p. 111], that behavior is still not comparable to failing to report a serious accident to Safety. Thus, no gender animus can be reasonably inferred from the company's failure to discharge Taylor based on his behavior.

Next, the plaintiff points to Tony Price's verbal threat to Kevin Taylor as evidence of disparate treatment. [Record No. 31-23, p. 5] A verbal threat is not similar to failing to report an accident. Marshall also claims that Phil Neal's altercation with a co-worker is comparable. [Record No. 31-23, p. 5] Again, this act is dissimilar to the failure to report an accident to Safety. The threats/arguments may have affected only Super Service, whereas Marshall's act affected Vascor, as well. Moreover, Marshall is not aware if Neal was disciplined. [Record No. 31-26, pp. 286–87]

Lastly, Marshall claims that Beachy's failure to quickly report the January 10, 2014 accident to Safety is comparable to her conduct. [Record No. 34, p. 26] However, it was not Beachy's duty to report the accident to Safety. [Record Nos. 31-28, p. 60; 31-31, p. 24; 34-1, p. 17; 34-5, p. 75] Marshall asserts that it should have been his duty and that she was confused about who had the duty of reporting accidents to Safety. [Record No. 34, p. 26] But Beachy was the Vascor Operations Manager, rather than a breakdown coordinator.[8] [Record No. 34-18, p. 2] Further, no one else in Marshall's department (the breakdown

---

[8]    The job description for the breakdown coordinator position states that it is the duty of the breakdown coordinator to report accidents to Safety. [Record No. 31-28, pp. 66–67]

department) was on duty when the accident was reported to her.  [Record No. 31-26, p. 202] Additionally, there is evidence that she reported accidents to Safety in the past.  [Record No. 31-19, p. 14]  Thus, Super Service has demonstrated that Marshall's and Beachy's situations differed in significant ways.[9]  Disparate treatment resulting from different employment situations does not raise an inference of discriminatory motive.

Although perhaps Beachy was partially to blame for allowing the reporting issue to slip through the cracks, Super Service was entitled to determine that Marshall was the primary culpable party.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (stating that "it is inappropriate for the judiciary to substitute its judgment for that of management").  Ultimately, Super Service's disparate treatment of Marshall is explained by the fact that the specified employees committed substantially different company violations or held substantially different positions.  Consequently, the evidence cited by Marshall does not raise an inference of discriminatory motive in the decision to discipline and/or discharge the plaintiff.[10]  *See Alomari*, 626 F. App'x at 566.

## 2.    Single-motive Discrimination

Because Marshall's discrimination claims cannot survive under a mixed-motive theory, they certainly cannot survive under a single-motive theory.  Under the *McDonnell-Douglas* framework, the plaintiff must first establish a *prima facie* case by showing that: (1)

---

[9]     Technically, Beachy did report the accident to Safety—he simply reported the accident at a later time.  On the other hand, Marshall never reported the accident to Safety.  [Record No. 31-30, pp. 74–75]

[10]     Additionally, Marshall has not provided any evidence regarding discipline of other employees who failed to report an accident to Safety (if they exist).  It appears that there have not been any male employees who failed to report an accident to Safety.  [Record Nos. 34-1, p. 69; 34-4, p. 81]

she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated, non-protected employees.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). In particular, for the aforementioned reasons, Marshall fails to identify similarly-situated employees who were treated differently.

Once a *prima facie* case is shown, a defendant must produce a "legitimate, nondiscriminatory reason" for the adverse action(s).  *See Wright*, 455 F.3d at 706.  With respect to the failure-to-transfer claim, Super Service provided a reasonable explanation why only three males were offered transfers.  Further, it has reasonably explained why Marshall's pay was reduced upon her transfer.  With regard to the discharge claim, Super Service has presented uncontested evidence that Marshall reported to work late on one occasion, failed to inform the appropriate supervisor of a day when she could not work, and failed to report a serious accident to Safety.  As a result, the defendant has met its burden of production.

Once the defendant meets this burden, the plaintiff must show that the nondiscriminatory reason is merely a "pretext for discrimination."  *See id.* at 707.  With respect to the failure-to-transfer and pay-reduction claims, Marshall provides no evidence concerning why Super Service's reasons are mere pretext.  With regard to the discharge claim, Marshall relies on Super Service's treatment of Roger Beachy to demonstrate that the nondiscriminatory reason is pretextual.  [Record No. 34, p. 26]  But this argument is not persuasive because he is not similarly-situated.

While Marshall argues that her error did not require her discharge and that there are reasonable explanations for it, "an employee cannot prove pretext even if the employer's

- 23 -

reason in the end is shown to be 'mistaken, foolish, trivial, or baseless.'"   *See id.* at 708 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).  "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action," and whether it "honestly believed" in its proffered reason.  *Id.* Here, Super Service provided evidence that it conducted an investigation into Marshall's failure to report the Vascor accident to Safety.  [Record No. 31-28, p. 59]  And it reasonably decided that because Marshall was the only breakdown coordinator on duty at the time, it was her responsibility to report the accident.  [Record No. 31-26, p. 202]

The Court will not "micro-manage" employment decisions absent evidence that Super Service failed to make a "reasonably informed and considered decision" before deciding to discharge the plaintiff.  *See Wright*, 455 F.3d at 708.  Because Marshall fails to provide sufficient evidence under both the single-motive and mixed-motive theories, Super Service is entitled to summary judgment on her discrimination claims under Title VII and the KCRA.[11]

### 3.   Retaliation

The plaintiff claims that Super Service retaliated against her because she: (i) complained about her pay reduction upon transfer; (ii) requested a raise when her duties were increased; (iii) expressed concern about working with Taylor; and (iv) made a formal complaint about sex discrimination against Kephart.  [Record No. 34, pp. 10, 20, 28]  She contends that such retaliation took the form of write-ups, disciplinary actions, and ultimately, her discharge from employment.  [*Id.*, p. 24]

---

[11]     The Court has not addressed, in detail, the KCRA mixed-motive standard because it is even higher than the Title VII mixed-motive standard.  *See Mendez*, 357 S.W.3d at 541.

The mixed-motive standard does not apply to retaliation claims. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). For a *prima facie* case of retaliation, the plaintiff must demonstrate that: (1) she "engaged in activity protected by Title VII;" (2) her "exercise of such protected activity was known by the defendant;" (3) "the defendant took an action that was materially adverse to the plaintiff;" and (4) "a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (internal quotation marks and citation omitted). Kentucky courts interpret retaliation under the KCRA consistent with its interpretation by federal courts. *Brooks v. Lexington-Fayette Urban Cnty. Housing Auth.*, 132 S.W.3d 790, 801, 803 (Ky. 2004).

If the plaintiff establishes her *prima facie* case, the burden of production shifts to the defendant, who must produce a legitimate, non-retaliatory reason for the adverse action. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). If the defendant succeeds in producing a legitimate reason, the burden shifts back to the plaintiff to show that the reason is mere pretext. *Id.* The ultimate burden of persuasion always rests with the plaintiff. *Laster*, 746 F.3d at 731.

### a.    *Prima Facie* Case

### i.    Protected Activities and Notice

There are two types of protected activity. First, the employer may not retaliate when an employee has "opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). Second, the employer may not retaliate when an employee has "participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Id.* "Activities

prior to the instigation of statutory proceedings are analyzed under the opposition clause." *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014).

Marshall cannot succeed on her retaliation claim under the *McDonnell-Douglas* framework. First, Marshall's complaints about working with Taylor did not constitute protected activities under Title VII. Marshall alleges that Super Service disciplined and discharged her because she complained about a potentially dangerous co-worker. [Record No. 34, p. 10] Even if Super Service fired Marshall for that reason, it does not imply that Super Service had an impermissible, gender-based motive. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) ("[T]he complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged *discrimination* against oneself or others; the alleged *discriminatory acts* need not be actually illegal . . . .") (emphasis added). Marshall does not claim that Taylor discriminated in any way against her or any other female at Super Service. Super Service could have just as easily discharged a male employee for complaining about his co-worker's dangerous attributes.

However, protected activities also include "opposing any practice that the employee reasonably believes to be a violation of Title VII . . . ." *Briggs v. Univ. of Detroit-Mercy*, 611 F. App'x 865, 871 (6th Cir. 2015). It was unreasonable for Marshall to believe that Taylor's actions at work were a violation of Title VII. Further, it was unreasonable for her to believe that Super Service was discriminating against her by keeping Taylor on duty. Moreover, Marshall did not put Super Service on notice that she was opposing a discriminatory practice. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013) (plaintiff "is required to put her employer on notice that her complaint concerns

- 26 -

statutory rights").  For example, she stated that she was concerned with "employee safety." [Record No. 31-13]  She also expressed concern that there was no supervisor on duty when she and Steve Duncan were working with Taylor.  [Record No. 31-10]  Thus, Marshall cannot succeed on a retaliation claim premised on her complaints about Taylor.[12]

Nor did Marshall's complaint about a pay reduction constitute a protected activity.  In her e-mail to Maat on July 22, 2012, she wrote, "[i]f an employee transfers to a different terminal, holding the same position and title, providing the company has not paid or offered any moving expenses, is their pay rate subject to change?"  [Record No. 31-3]  Additionally, when she asked for reinstatement of her original salary upon changing shift times, she did not give any indication that she believed Super Service was discriminating against her.  [Record No. 31-26, p. 56]  Because she failed to provide notice to Super Service that she was opposing a discriminatory practice, any retaliation claim premised on this theory cannot succeed.  *See Brown*, 545 F. App'x at 373.

Super Service also argues that Marshall's "formal complaint" against Kephart is not a protected activity because it did not put Super Service on notice that Marshall was opposing gender discrimination.  In Marshall's "formal complaint" e-mail sent to Maat on May 14, 2013, she stated that Kephart's actions were "discriminatory."  [Record No. 31-13]  In the e-mail sent two days later, Marshall explained that Kephart "ha[d] an issue addressing and

---

[12]     In her deposition, the plaintiff alleged that Taylor assaulted his wife after leaving work in the middle of his shift.  [Record No. 31-19, pp. 25−26]  She also claimed to have informed Kidd that Taylor was charged with his third offense against a woman.  [*Id.*, p. 26]  These facts suggest that Taylor posed an increased threat towards women (as opposed to men) and that such a threat might materialize at work.  However, because Marshall never claimed that Taylor discriminated against her or any other female employee, Super Service was not notified that she was complaining of a Title VII violation.  *See Brown*, 545 F. App'x at 373.

dealing appropriately with female employees." [Record No. 31-15] She also stated that

Kephart was "alienating female supervisor Kim Caldwell." [*Id.*]

"[C]omplaints to human resources personnel regarding potential violations of Title

VII constitute protected activity . . . ." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*,

495 F. App'x 651, 655 (6th Cir. 2012). Although it is a close call whether Marshall

reasonably believed Kephart's actions constituted discrimination against women, due to the

Sixth Circuit's "broad interpretation of protected activity," the Court finds that Marshall

meets her burden of establishing a protected activity under Title VII. *Simpson v. Vanderbilt

Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). Both John Kidd and Steve Maat received

Marshall's e-mails. As a result, the defendant was aware of Marshall's participation in a

protected activity, and the analysis continues.[13] *See Laster*, 746 F.3d at 730.

### ii.    Materially Adverse Actions

The "materially adverse action" element of a retaliation claim is less restrictive than

the "adverse employment action" element of a discrimination claim. *See Laster*, 746 F.3d at

719 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). A

materially adverse action is an action that would have "dissuaded a reasonable worker from

making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

---

[13]    It is significant that when Maat asked Marshall to provide details regarding Kephart's
allegedly discriminatory behaviors, she did not respond. [Record Nos. 31-16, p. 2; 34-1, p. 53]
However, Marshall's prior claims regarding Kephart were sufficient to put Super Service on
notice that she was alleging gender-based discrimination. Although the evidence thus far
demonstrates that Kephart was not aware of Marshall's complaint against him [Record No. 31-
29, p. 66], because Steve Maat was involved in her discharge decision and was aware of the
protected activity, the plaintiff has established notice. *See Lewis-Smith v. W. Ky. Univ.*, 85 F.
Supp. 3d 885, 910 (W.D. Ky. 2015) (one decision-maker was unaware of the protected activity
but genuine issue of material fact existed concerning whether other decision-maker had
knowledge of the protected activity).

While write-ups and disciplinary actions qualify as materially adverse actions under the *Burlington Northern* standard, none of these occurred after Marshall's e-mail complaints alleging that Kephart was discriminating against her.   Only Marshall's shift-change and discharge occurred after the e-mails.   A discharge is a materially adverse action.   *See Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 583 (6th Cir. 2014).   In addition, a schedule-change may constitute an adverse action under certain circumstances.   *See, e.g., Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 922 (W.D. Tenn. 2011).

### iii.   Causal Connection

"[T]he proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection."   *See Ford v. Gen. Motors Corp.*, 305 F.3d 545, 555 (6th Cir. 2002) (internal quotation marks and citation omitted).   In the present case, nearly seven months passed between Marshall's complaints about gender-discrimination and the shift-change.   [Record No. 31-15; 31-26, p. 186]   Marshall has produced very little evidence connecting these May complaints with her shift-change in December; however, the Court notes that Kephart (the subject of the complaints) decided to implement the shift-change.   [Record No. 34-1, p. 64]   But because the shift-change was implemented with respect to all breakdown coordinators at the Somerset terminal [Record No. 31-17], Marshall fails to establish a causal connection between the protected activity and the materially adverse action.   *See, e.g., Cherry v. Unipres U.S.A., Inc.*, No. 3:04CV0036, 2006 WL 288645, *6 (M.D. Tenn. Feb 6, 2006) (reasoning that shift-change was not materially adverse action where action affected all employees on third shift equally).

- 29 -

Nearly eight months passed between Marshall's complaints about gender-based discrimination and the decision to discharge her from employment. [Record Nos. 31-13; 31-15; 34-1, p. 29; 31-20] Marshall has produced very little evidence connecting these May 2013 complaints with her termination in January of the next year. However, the Court again notes that Kephart (the subject of the complaints) was involved in her termination decision. [Record No. 31-20] Because this is a fact-intensive question at the summary judgment stage, the Court concludes that an issue of fact is presented regarding whether Marshall established a causal connection between the protected activity and the discharge decision. *But see Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 349 (6th Cir. 2008) ("[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.") (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

### b.      Legitimate, Non-retaliatory Reason

Super Service has proffered evidence of a "legitimate, non-retaliatory reason for terminating" the plaintiff. *See Hugo v. Millennium Lab., Inc.*, 590 F. App'x 541, 545 (6th Cir. 2014) (internal quotation marks and citation omitted). Marshall did not comply with company procedure when she failed to report a serious Vascor accident to Safety. [Record Nos. 31-30, p. 74; 31-28, p. 60; 31-31, p. 24; 34-1, p. 17]

### c.      Pretext

Marshall argues that Super Service's proffered reason for discharging her is mere pretext. [Record No. 34, p. 26] To demonstrate pretext, the plaintiff must establish that the

defendant's "stated reasons had no factual basis, did not actually motivate [its] decision to terminate [her], or were insufficient to support [its] decision." *Hugo*, 590 F. App'x at 545. Further, "[a]s long as an employer has an honest belief" in its non-retaliatory reason for taking a materially adverse action, "the employee cannot establish that the reason is pretextual simply because it is ultimately shown to be incorrect." *See Vaughn*, 302 F. App'x at 350 (internal quotation marks and citation omitted).

Marshall does not allege that Super Service's stated reason has no factual basis. While at times she quibbled with whether her failure to report provided sufficient support for Super Service's decision, she appears to have abandoned this argument. [*See* Record No. 34, p. 26.] Instead, Marshall argues that Super Service's proffered reason did not actually motivate its decision to discharge her by pointing to the fact that Roger Beachy was not discharged for failing to immediately report the accident to Safety. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009) ("In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals . . . .") (addressing *prima facie* case). [Record No. 34, p. 26]

As discussed above, Beachy was not similarly-situated to the plaintiff because it was not his duty to report the accident to Safety. *See Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 838 (6th Cir. 2012) ("Plaintiff has failed to demonstrate any specific way in which he was treated differently than a similarly situated non-white employee."); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (reasoning that comparators must be "subject to the same standards and have engaged in the same conduct without such

- 31 -

differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").  [Record Nos. 31-28, p. 60; 31-31, p. 24; 34-1, p. 17] Beachy's differing role explains why Super Service treated his conduct differently.  [Record No. 34-18, p. 2]

Further, Beachy had a different supervisor.  *See Mitchell*, 964 F.2d at 583 ("[T]o be deemed similarly-situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, . . .") (internal quotation marks omitted). Because Beachy was not "similarly situated in all respects," he is not an appropriate comparator, and any evidentiary weight associated with his non-termination is negligible. *See id.*; *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002) (focusing more closely on the similarities and differences between plaintiff and comparator where the plaintiff sought to establish pretext primarily with evidence that a similarly situated employee received disparate treatment for the same conduct).[14]   Moreover, Marshall concedes that she never informed management that Beachy allegedly told her that he would contact Safety.  [Record No. 31-26, p. 265]   Under the "honest belief" standard, Super Service's decision to terminate Marshall was especially reasonable because the company was unaware of a potential mitigating circumstance.  *See Vaughn*, 302 F. App'x at 350.

The plaintiff asserts that Beachy's position "should also be to protect the Company." [Record No. 34, p. 26]  She also questions "how do [the supervisors] bridge the gap to say

---

[14]      *See also Manzer v. Diamond Shamrock Chemicals, Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009), ("The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in *substantially identical* conduct to that which the employer contends motivated its discharge of the plaintiff.") (emphasis added).

she bears the whole of the responsibility, and Roger Beach[y] bears none of it?"  [*Id.*]  But these are the types of questions that *Smith* sought to avoid.  220 F.3d at 763.  While Super Service's reason for firing Marshall involved some "subjective factors, [it was] clearly sufficient to dispel the inference of discrimination." *Daniels v. Bd. of Educ. of Ravenna City School Dist.*, 805 F.2d 203, 209 (6th Cir. 1986).

### 4.      Hostile Work Environment

### a.      Exhaustion – Title VII

Super Service also argues that Marshall failed to exhaust her hostile work environment claim under Title VII.[15]   [Record No. 31-1, p. 33]   An employee alleging employment discrimination must first file a charge with the EEOC within 180 days of the alleged violation, subject to certain exceptions.  42 U.S.C. § 2000e-5(e)(1).  Generally, a plaintiff may not bring claims in a lawsuit if they were not included in the charge.  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).   "[T]he inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion."  *Id.* at 362.  In other words, when a plaintiff describes only discrete discriminatory or retaliatory acts in the charge, she fails to exhaust her claim "unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Id.*

Marshall's EEOC charge alleged only that: (i) she received a pay reduction upon transfer; (ii) her workload was subsequently increased without a corresponding pay increase; (iii) Kephart discriminated against her based on her sex; and (iv) the company retaliated

---

[15]      Marshall has not responded to this argument.

against her for making a discrimination complaint.   [Record No. 31-21]   Her "Intake Questionnaire" merely expanded on these issues.   [Record No. 31-23]   For example, Marshall explained that her discharge followed her failure to report an accident to Safety and that male employees violated company policies without repercussions.  [*Id.*]

With respect to a hostile work environment claim premised on Kevin Taylor's behavior, Marshall did not reference his domestic abuse charges and violent conduct in her EEOC charge.  [*See* Record No. 31-23, p. 5.]   Nor did she indicate that he harassed her in any way.   Consequently, Marshall failed to exhaust the hostile work environment claim insofar as it is premised on Taylor's behavior.  *See Younis*, 610 F.3d at 361.  However, the Court will address the merits of that part of the claim in the discussion that follows, particularly because the KCRA does not involve an administrative exhaustion requirement.

Regarding her contention that supervisors at Super Service created a hostile work environment, Marshall relies upon the same facts to support both her discrimination and hostile work environment claims.  As a result, the Court will not grant summary judgment to the defendant with respect to that part of the Title VII claim on the basis of failure to exhaust.[16]  However, the Court doubts that a hostile work environment claim can be "reasonably inferred from the facts alleged in the charge."  *See id.* at 362.

---

[16]      Super Service also asserts that Marshall's hostile work environment claim is barred because, even if it had been included in the EEOC charge, it would be untimely.  [Record No. 31-1, p. 42]  Most of the alleged harassment occurred in May 2013, but the charge was filed in March 2014.  *See* 42 U.S.C. § 2000e-5(e)(1).  [Record No. 31-21]  However, to the extent Marshall argues that the termination decision was part of the hostile work environment claim, the Court has considered the merits.  Further, the lack of an administrative exhaustion requirement in the KCRA requires that the Court to consider the merits of the claim under the KCRA.

### b.    Merits[17]

"[D]iscriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of employment" creates a hostile work environment.  *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (2008).  "[C]onduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive."  *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  A hostile work environment claim brought under the KCRA is "analyzed in the same manner as a claim brought under Title VII."  *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).

A plaintiff may support a hostile work environment claim with direct or indirect evidence.  *See Barrett*, 556 F.3d at 514.  The mixed-motive theory does not apply to hostile work environment claims.  *See Alexander v. Univ. of Ky.*, No. 5:10-CV-48-REW, 2012 WL 1068764, *20 (E.D. Ky. Mar. 28, 2012) (citing *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994)).  Under the *McDonnell Douglas* framework, for a *prima facie* case of hostile work environment, a plaintiff must establish that: (i) she was a member of a protected class; (ii) she was subjected to unwelcome harassment; (iii) the harassment was based on sex; (iv) the harassment unreasonably interfered with her work performance; and (v) the employer is liable.  *See Barrett*, 556 F.3d at 515.

---

[17]    The defendant asserts that the EEOC's determinations are highly probative of the ultimate issues involved in this case.  [Record No. 39, p. 11]  Although the Court has reviewed the EEOC's decision, the decision has not influenced the Court's determination of the issues.  *But see Garrett v. Sw. Med. Clinic P.C.*, No. 1:13-cv-634, 2014 WL 7330947, *13 (W.D. Mich. Dec. 19, 2014) (EEOC determination may be admissible at trial).

###### i.      Taylor

Marshall claims that Super Service is responsible for the alleged hostile work environment she experienced while working with Kevin Taylor, an individual with a history of domestic abuse charges and a charge pending in April 2013.  [Record No. 34, p. 16] While she has established that she was in a protected class, Marshall fails to allege specific facts concerning whether Taylor subjected her to unwelcome sexual harassment.  In fact, Marshall stated in her deposition that Taylor did not harm her, speak to her in a "harsh" manner, or act inappropriately towards her.  [Record Nos. 31-26, p. 110; 31-27, p. 44] Although Marshall may have feared Taylor due to his behavior outside of work, he did not harass her.  Consequently, Marshall fails to satisfy the second prong of the analysis outlined in *Barrett*, 556 F.3d at 515.

Even though Taylor allegedly cursed at a vendor and slammed down a phone, his reaction was not directed at Marshall in any way.  [Record No. 34-19, p. 77]  Even if the Court determined that such conduct created an abusive environment, Marshall has not made a showing that the conduct was based on sex.  *See Barrett*, 556 F.3d at 515.  Nor has she asserted that it unreasonably interfered with her work performance.  *See id.*  Thus, Marshall's claim that working with Taylor constituted a hostile work environment must fail at this stage.[18]

---

[18]      Marshall stated during her deposition that Taylor twice showed her photographs of "nude" females on his cellphone.  [Record No. 31-26, p. 300]  She later described the females in the photographs as "scantily clad."  [*Id.*, p. 302]  However, Marshall does not mention these incidents in her briefs, and she does not argue that the conduct was sufficiently severe or pervasive or that it interfered with her work performance.  *See Barrett*, 556 F.3d at 515.  Moreover, Marshall admits that she never informed Super Service of this behavior, and she fails to assert any reason why Super Service "should have known" that such conduct was occurring.

### ii.     Kephart and Other Supervisors

The plaintiff makes very general claims that she was subjected to a hostile work environment caused by her supervisors.[19]  [Record No. 34, p. 23]  A plaintiff meets the third prong of the analysis with either direct evidence of gender-specific and derogatory terms or comparative evidence of how the alleged harassers treated members of both sexes in the workplace.  *See Wade v. Automation Personnel Servs., Inc.*, 612 F. App'x 291, 298 (6th Cir. 2015).  The only potentially "direct evidence" provided by Marshall is Kephart's comment about the inappropriate length of her skirt.  For the reasons stated above, this comment is better viewed as indirect evidence.

Marshall's comparative-evidence argument ultimately fails.  As outlined above, with respect to the transfer situation, Marshall has not demonstrated that the male employees who were offered transfers were appropriate comparators.  Regarding discipline, Marshall conceded that Taylor was cited for leaving work early, indicating that he was punished more severely than she was for arriving late.  [Record No. 31-26, p. 268]  In addition, Price and Neal's alleged misconduct was dissimilar to hers, so they are not appropriate comparators. [Record No. 31-23, p. 5]  Moreover, while Beachy's conduct most closely resembled Marshall's conduct, he is not an appropriate comparator because he had different duties. [Record No. 34-18, p. 2]  Because legitimate reasons support the differences in treatment

---

*See Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999).  [*Id.*, p. 303]  Thus, any hostile work environment claim premised on this behavior cannot withstand summary judgment.

[19]     Marshall only references facts relevant to such a claim when discussing Kephart.  Her complaints regarding Super Service not offering her a transfer and reducing her pay are more relevant to the discrimination claim.  The same limitation applies to her arguments concerning write-ups.  However, the Court will consider all of the evidence presented in determining whether Marshall has established a *prima facie* case of a hostile work environment.

between Marshall and other employees, no inference of gender-based harassment can be drawn from these disciplinary instances. *See Wade*, 612 F. App'x at 298.

As a result, most of Marshall's argument concerns the way that she was treated by Kephart. Essentially, Marshall contends that he harassed her by repeatedly questioning her truthfulness, scrutinizing her performance, speaking to her in a disrespectful way, and dismissing her concerns. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) ("[F]acially neutral incidents may be included in a hostile-work-environment analysis of the totality of the circumstances when there is some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."). [Record No. 34, p. 27] Marshall only speculates regarding how Kephart treated other women, and at least one other female refutes Marshall's speculation. [*See id.;* Record No. 31-28, pp. 52–53] The plaintiff has produced insufficient circumstantial evidence to provide a basis for inferring that Kephart's (or any other supervisor's) conduct towards her constituted sexual harassment. *See Waldo*, 726 F.3d at 815.

Even if the Court determined that Marshall had met the third prong of the analysis, her argument fails at the fourth prong. The Court considers "the frequency of the discriminatory conduct; its severity;[20] whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" in determining whether the plaintiff has satisfied the fourth prong. *Wade*, 612 F. App'x at 296. Here, Kephart's behavior towards Marshall was infrequent. It only

---

[20]    The Court notes that the allegedly harassing conduct need only be sufficiently severe *or* pervasive. *See Waldo*, 726 F.3d at 814. However, when the conduct is not extremely severe or extremely pervasive, the Sixth Circuit looks at the totality of the circumstances, considering the above factors. *See id.*

occurred when she failed to follow procedures [*see* Record Nos. 31-7; 31-23], or when Marshall contacted Kephart regarding a complaint. [*See, e.g.*, Record Nos. 31-10; 31-13]  As a result, this factor weighs against a finding in Marshall's favor.

Nor was the conduct severe.  Marshall was written-up for violating documented company rules.  [Record No. 31-2]  Other than this incident, Marshall claims that Kephart was disrespectful and dismissive towards her.  But Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  In other words, "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," do not constitute harassment.  *Id.*  Here, Marshall does not even allege that Kephart, or any other supervisor, used abusive language, made gender-related jokes, or teased her.  Instead, Marshall focuses on how she felt.  [*See* Record Nos. 34, p. 27; 31-26, pp. 13-18.]  Kephart's shrugging of his shoulders and holding his palms pointed toward the sky simply do not constitute the kind of harassing conduct contemplated by the statute.[21]  *See Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003) (holding that a supervisor ignoring the plaintiff, encouraging co-workers to do the same, criticizing her work, and withholding her mail did not satisfy the fourth prong).  [Record No. 31-26, p. 241]

Because Marshall cannot satisfy the second, third, and fourth prongs of the hostile work environment analysis, the Court need not address the fifth prong.  However, the Court notes that vicarious liability applies where the conduct pertained to supervisors.  *See Barrett*, 556 F.3d at 516.  And Super Service did not argue the affirmative defense to liability.  *See id.*

---

[21]    Marshall has not provided evidence that the alleged harassment interfered with her work performance.  However, the Court has analyzed the frequency and severity of the alleged behaviors to determine if the conditions of the workplace were altered in such a way as to create an abusive working environment.  *See Barrett*, 556 F.3d at 514.

However, Super Service had a policy for reporting sexual harassment [Record No. 31-2, pp. 5–6], and by failing to provide details regarding harassment to Super Service, Marshall likely "failed to take advantage of any preventative or corrective opportunities" provided to her. *See Faragher*, 524 U.S. at 807 (employer must prove that it exercised reasonable care to prevent/correct behavior and plaintiff failed to take advantage of the opportunities for prevention/correction).

### C.    Plaintiff's Motion for Summary Judgment

The undisputed facts demonstrate that Super Service is entitled to summary judgment on Marshall's claims of sex-based discrimination, retaliation, and hostile work environment. As a result, the Court will deny her motion for summary judgment.

### IV.

Based on the foregoing analysis and conclusions, it is hereby

**ORDERED** as follows:

1.    Defendant Super Service, LLC's motion for summary judgment [Record No. 31] is **GRANTED**.

2.    Plaintiff Joy Marshall's motion for summary judgment [Record No. 35] is **DENIED**.

3.    Defendant Super Service, LLC's Corrected Motion to Strike Plaintiff's Expert [Record No. 59] is **DENIED**, as moot.

4.    All claims and causes of action asserted in this proceeding by Plaintiff Joy Marshall against Defendant Super Service, LLC, are **DISMISSED**, with prejudice.

- 40 -

5.     This action is **DISMISSED**, with prejudice, and **STRICKEN** from the Court's docket.

6.     The trial of this matter, previously scheduled for April 19, 2016, is **CANCELED**.

This 6th day of April, 2016.

Signed By:

*Danny C. Reeves*  DCR

**United States District Judge**